UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION- FLINT

IN RE:

    JOSEPH W. HOOD,                                    Case No. 12-31147-dof
                                                                               Chapter 7 Proceeding
                Debtor.                                  Hon. Daniel S. Opperman
_____/
LORIE HUNT,

    Plaintiff,

v.                                                                                 Adversary Proceeding
                                                                               Case No. 12-3228-dof
JOSEPH W. HOOD,

    Defendant.
_____/

## OPINION GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Lorie Hunt, seeks summary judgment in this Adversary Proceeding, filed by her to determine the dischargeability of a debt owed to her by Defendant Joseph Hood, the Debtor in this bankruptcy case. This action is brought pursuant to 11 U.S.C. § 523(a)(6), and is based on a judgment for Plaintiff against Defendant in the total amount of $464,730.00, plus interest. For the reasons stated in this Opinion, the Court grants Plaintiff's Motion for Summary Judgment.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts). The issues in this Adversary Proceeding arise from Title 11 of the United States Code and do not involve any matter which limits this Court's jurisdiction as detailed by the United States Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), and later by the Sixth Circuit

1

Court of Appeals in *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

Facts

Plaintiff previously worked for Defendant as the finance manager at Joseph Chevrolet, Inc., a company which Defendant owned. During her employment, Plaintiff suffered alleged unwanted sexual advances from Defendant after a long term relationship ended. Plaintiff initiated an arbitration proceeding alleging sexual harassment, which resulted in an Interim Opinion and Award on June 8, 2007, finding Quid Pro Quo sexual harassment under the Elliot Larson Civil Rights Act ("ELCRA"). For purposes of this Opinion, the Court adopts the Interim Opinion and Award of the Arbitrator, specifically the following:

> This is an employment arbitration in which Claimant Lorie Hunt alleges that she was discharged from her position as a Finance Manager at Respondent Joseph Chevrolet, Inc. ("Joseph Chevrolet") on November 11, 2005 in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII") and the Michigan Elliott Larsen Civil Rights Act ("ELCRA"). Claimant raises claims of quid pro quo sexual harassment and retaliatory discharge under both statutes. Specifically, she alleges that she was terminated because she ended a sexual relationship with Joseph Chevrolet's owner, Respondent Joseph Hood, and subsequently made complaints of sexual harassment by other employees at the dealership.
> The arbitrator heard eight days of testimony on December 11, 12, 13, and 14, 2006, and January 8, 9, 10, and 19, 2007. Upon receipt of that evidence and consideration of the parties' arguments and post-arbitration briefs, this arbitrator finds that Claimant has failed to offer sufficient evidence to prove her retaliatory discharge claim under the ELCRA. Furthermore, both of Claimant's Title VII claims are barred by her failure to first file an appropriate complaint with the Equal Employment Opportunity Commission ("EEOC"). However, Claimant did satisfy her burden of proof on the quid pro quo claim under the ELCRA and is entitled to back pay and mental anguish damages in the amount of $168,000. Claimant shall also be reinstated immediately to the position of Finance Manager at Joseph Chevrolet on the terms and conditions existing at the time of her firing.
> A.     <u>The Quid Pro Quo Claim under the ELCRA</u>
> The ELCRA prohibits an employer from imposing a tangible job detriment as a consequence of the employee's failure to submit to the sexual demands of a supervisor. *See* MCL § 37.2202; *Chambers v. Tretico*, 463 Mich. 297, 310 (2000). In order to establish a claim of quid pro quo harassment, an employee must, by a preponderance of the evidence, demonstrate: (1) that she was subject to any of the

types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment. *See Chambers*, 463 Mich. at 310. The statutory language does not require that employee's refusal be the sole justification for the adverse employment action. Rather, the refusal need only be one factor in the termination decision. MCL § 37.2103(i).

There is no dispute that Claimant and Mr. Hood maintained a sexual relationship for approximately four years. There is also no dispute that both Claimant and Mr. Hood recognized and acknowledged the dangers of maintaining a sexual relationship that arose out of an employment situation. Much of the evidence presented during the course of arbitration focused on the question of who terminated that relationship in September, 2005. Respondents have taken the position, based on the testimony of Mr. Hood, that it was he who called things off. This was simply not born out by the evidence, as Mr. Hood was unable to point to any occasion on which he communicated his decision to Claimant, with the exception of an October 22, 2005 letter sent several weeks after Claimant had already transmitted a similar letter to him stating that the relationship was over. Even assuming that Mr. Hood initiated the break-up, however, the evidence still demonstrates that Claimant was subject to unwelcome sexual conduct insofar as Mr. Hood had a change of heart and was seemingly determined to win back Claimant's affections. Following the September 21, 2005 telephone call marking the end of their relationship, Mr. Hood left Claimant voicemail and/or email messages on September 30, October 3, and October 12, 2005 stating that he thought about her "all the time." Claimant did not reciprocate these communications, and Mr. Hood's effort to continue sexual relations following the parties' break-up stands as an unwelcome sexual advance under the ELCRA.

Claimant has also proven by a preponderance of the evidence that her refusal to reconcile with Mr. Hood was a significant factor in her termination. Claimant credibly testified that Mr. Hood warned her on several occasions during the course of her employment that breaking up with him was "not an option" and that she would be "out of a job" if she ended their relationship. Indeed Mr. Hood made these comments on at least two occasions during the year that Claimant was terminated, including on September 4, 2005, just two months before the termination decision. These pointed and repeated threats made proximate in time to the critical events giving rise to this arbitration simply cannot be dismissed as stray remarks. This arbitrator is left with no doubt that when Claimant rejected Mr. Hood's advances, he followed through with the warnings that he had repeatedly given her in the past and instructed company counsel to terminate her employment.

There was considerable testimony at the hearing devoted to the issue of whether or not Claimant intended to quit her job at the dealership at the end of 2005. It is logically inconsistent to the arbitrator that an individual who intended to voluntarily leave her employment would engage the services of an attorney to preserve her job shortly before her termination. Considering all of the evidence

3

presented, the arbitrator believes that the preponderance of the evidence indicates that the Claimant did not intend to quit her job at Joseph Chevrolet. Regardless, Claimant's alleged statements that she intended to quit her employment with Joseph Chevrolet by the end of 2005 do not offer a legitimate and nondiscriminatory reason for the employment decision. Indeed Stanley Gilhool, the individual who delivered the termination decision, acknowledged that Claimant was not terminable simply because she announced her intent to leave the company, and that the decision was made only after she refused to discuss her employment situation with him at the advice of her attorney. Claimant's refusal in this regard was inextricably bound up with the sexual harassment that she was experiencing from Mr. Hood. If, in fact, the Claimant expressed any desire to quit, the arbitrator believes it was due, at least in part, to the increasingly uncomfortable situation spawned by the behavior of Respondent Hood, who vacillated between threatening to fire her, refusing to work with her, and attempting to rekindle a sexual relationship which Claimant did not wish to continue. In short, Respondents created an unwelcome and sexually charged atmosphere and cannot now justify the termination decision on that ground that Claimant threatened to quit.

Respondents have also failed to prove that Claimant attempted to recruit other Joseph Chevrolet employees under the after-acquired evidence doctrine. The testimony of three of the "recruited" witnesses, Robin Parker, Amanda Hiser, and Gary Niver, was discredited by Claimant. The evidence demonstrated that the fourth witness, Gary St. Charles, was recruited by Rick Stokes, not Claimant. There is no after-acquired evidence defense.

. . .

    D.    <u>Mitigation of Damages</u>

Michigan law obligates an employment discrimination plaintiff to "make reasonable efforts to find employment after discharge." *Morris v. Clawson Tank Co.,* 459 Mich. 256, 264-70 (1998). This does not mean that a plaintiff must "make all efforts to eliminate the economic damages resulting from the wrongdoing," nor must a plaintiff seek out "like employment" or employment "with compensation equivalent to the job lost." *Id.* Rather, a plaintiff must only "make efforts that are reasonable under the circumstances to minimize the economic harm caused by the wrongdoer," and is required to "accept, if offered, employment that is substantially similar to that from which the plaintiff was fired." *Id.* A plaintiff who fails to appropriately mitigate her damages loses the right to claim full back pay as damages. *Id.*

The evidence demonstrated that Claimant did make an effort to mitigate the damages flowing from her termination at Joseph Chevrolet. She began work with Millenium Marketing, a real estate marketing company, within weeks after her departure from Joseph Chevrolet, and presented testimony by co-owner Chevonne Byrant demonstrating that her anticipated income was $76,000 per year. Although this job represented a $36,000 per year pay cut from her prior position at Joseph

4

Chevrolet and was certainly not without risk given Millenium's status as a start-up company, it is the decision of this arbitrator that Claimant's decision to accept that employment was reasonable given the immediate availability of the job, her lack of a college degree, and Respondent Hood's warnings that he would make sure that she did not work in the automotive industry again.

It is equally clear, however, that Millenium Marketing was not a success, and that Claimant's efforts to secure alternate employment have been both sporadic and substantively inadequate. Although Claimant earned virtually no income during the course of her employment with Millenium, she waited seven months to begin preparing a resume to obtain alternate employment, and ten months to submit job applications. When she finally made the decision to seek alternate work, she only targeted nine dealerships, and failed to engage in any discernible networking efforts to locate a new position. Claimant had made no further efforts to locate other employment at the time of the arbitration hearing, and this arbitrator simply is not convinced that she is truly applying herself to the job search process.

As a consequence of the damage evidence, Claimant's back pay award will be limited to $112,000 - a single year's salary at her position with Joseph Chevrolet - plus interest on this amount computed at the Michigan judgment rate from the date of filing the arbitration demand to the date of payment. In addition to this sum, Claimant shall also be awarded $56,000 - one-half of the back pay award - in emotional distress damages in recognition of the hardships occasioned by the termination decision. While the arbitrator recognizes that in some employment situations emotional distress damages can be a multiple of the award of economic damages, in this case the testimony and evidence related to Claimant's emotional distress was minimal. These damages are entered jointly and severally against both of Respondents. I will retain jurisdiction for the sole purpose of determining whether attorney fees should be borne equally by the parties or divided in some other appropriate manner. In that regard, the parties are directed to file a brief with the American Arbitration Association by not later than Monday, July 2, 2007, setting forth their position on the issue of attorney fees. Unless a hearing is requested by either party, I will proceed to decide the issue of attorney fees on the briefs submitted by the parties in a written Opinion which will be submitted to the American Arbitration Association not later than July 18, 2007.

There will be no award of front pay. Given Claimant's exemplary record of job performance at Joseph Chevrolet and the barriers identified by her vocational expert to alternate employment, Claimant shall be immediately reinstated to her prior position as Finance Manager on the same terms and conditions that existed at the time of her termination. Indeed, during his testimony Mr. Hood indicated that Claimant "should be working for this company today." Tr. 287. This arbitrator is hopeful that everyone involved in this unfortunate incident has learned a lesson from the indiscretions giving rise to the proceeding, and that both Claimant and Mr. Hood will find a way to keep their personal lives separate from their professional responsibilities so that they can continue to profit from an otherwise mutually beneficial business relationship.

5

After entry of the Final Opinion and Award of the Arbitrator on August 3, 2007, the Tuscola County Circuit Court entered Judgment in favor of Plaintiff against Defendant on January 23, 2008, which then entered final judgment after an appeal to the Michigan Court of Appeals. Final judgment was entered on February 14, 2011, in the amount of $464,730.00, plus interest ("State Court Judgment"). After Defendant filed a Chapter 7 bankruptcy on March 16, 2012, Plaintiff commenced this Adversary Proceeding on June 21, 2012, to determine the nondischargeability of this debt pursuant to 11 U.S.C. § 523(a)(6), asserting that this debt is the result of Defendant's willful and malicious actions. Plaintiff then filed the instant Summary Judgment Motion, asserting that the State Court Judgment collaterally estops Defendant from contesting the willful and malicious nature of the debt owing to her, and is, thus, nondischargeable pursuant to Section 523(a)(6). Defendant timely responded to Plaintiff's Motion, denying that summary judgment is appropriate.

Summary Judgment Standard

Federal Rule of Civil Procedure 56 is made applicable in its entirety to bankruptcy adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The burden then shifts to the nonmoving party once the moving party has met its burden, and the nonmoving party must then establish that a genuine issue of material fact does indeed exist. *Janda v. Riley-Meggs Industries, Inc.*, 764 F. Supp 1223, 1227

6

(E.D. Mich. 1991). In other words, summary judgment may be appropriately granted where the issues in a particular case involve solely the application of law to undisputed facts. *Choate v. Landis Tool Co.*, 486 F. Supp. 774 (E.D. Mich. 1980).

<u>Application of Collateral Estoppel</u>

Collateral estoppel applies in bankruptcy dischargeability actions. *Grogan v. Garner*, 498 U.S. 279 (1991). The *Grogan* Court also determined that a preponderance of the evidence standard must be used for collateral estoppel determinations in dischargeability proceedings. *Grogan*, 498 U.S. at 291. For collateral estoppel to apply, the parties must be the same, the prior proceeding must have culminated in a valid, final judgment, and the issue must have been actually litigated and necessarily determined. *See People v. Gates*, 434 Mich. 146, 154, 452 N.W.2d 627 (1990). An issue may be considered "actually litigated" for collateral estoppel determinations if it "is put into issue by the pleadings, submitted to the trier of fact, and determined by the trier of fact." A trial is not necessarily required. *Latimer v. Mueller & Son, Inc.*, 149 Mich. App. 620, 640-41, 386 N.W.2d 618 (1986). If an issue is essential to the judgment, it is "necessarily determined." *Gates*, 434 Mich. at 158.

In this case, there was a judgment after arbitration, and a final judgment was entered by the state court, culminating in the February 14, 2011, State Court Judgment. Further, there is no question the parties were the same in the state court proceeding and this one. There is also no dispute that the prior State Court Judgment was valid and final.

The Court next examines the "actually litigated" and "necessarily determined" elements, as well as Section 523. This Court is directed to first review the state court pleadings, upon which the State Court Judgment was entered. *See Cresap v. Waldorf (In re Waldorf)*, 206 B.R. 858, 865

7

(Bankr. E.D. Mich. 1997) (citing *Wheeler v. Laudani*, 783 F.2d 610, 615-16 (6th Cir. 1986) ("To determine the full meaning and effect of an ambiguous prior state judgment, the bankruptcy court must examine the entire record of the state proceedings."). While the Court does not have the entire arbitration record upon which the Arbitrator made his findings and upon which the State Court Judgment was based, the Court does have the Arbitrator's Interim and Final Opinions and Awards, and the State Court Judgment, which adopted the Arbitrator's findings. Thus, this Court will base its conclusions on the Arbitrator's findings and conclusions, and the State Court's adoption of same via the February 14, 2011, State Court Judgment. To see if remaining elements of collateral estoppel exist, the Court will examine the bankruptcy elements of Section 523.

### Section 523(a)(6)

Section 523(a)(6) authorizes a bankruptcy court to exclude a debtor from receiving a discharge "from any debt for willful and malicious injury by the debtor to another entity or the property of another entity." The exceptions to discharge are to be narrowly construed in favor of the debtor. *Monsanto Co., v. Trantham (In re Trantham)*, 304 B.R. 298 (B.A.P. 6th Cir. 2004) (citing *Meyers v. I.R.S.*, 196 F.3d 622 (6th Cir. 1999)); *see also Walker v. Tuttle (In re Tuttle)*, 224 B.R. 606, 610 (Bankr. W.D. Mich. 1998) ("Courts will narrowly construe the language of § 523 to assure the debtor has an opportunity for a fresh start.") A party must prove by a preponderance of the evidence that a debtor committed an injury that is both willful <u>and</u> malicious. *Grogan v. Garner*, 498 U.S. 279 (1991).

In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the United States Supreme Court discussed and determined the meaning of the language used in 11 U.S.C. § 523(a)(6). The issue before the United States Supreme Court involved "whether a debt arising from a medical malpractice judgment

8

attributable to negligent or reckless conduct" fell within 11 U.S.C. § 523(a)(6). *Id*. at 59. The Kawaauhaus argued that the malpractice award fell within the Section 523(a)(6) exception because Dr. Geiger engaged in the intentional act of providing inadequate medical services which led to Mrs. Kawaauhau's injury. *Id*. at 61.

In analyzing the parameters of the language "willful and malicious injury," the United States Supreme Court found that:

> [T]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." . . . [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences of an act,"* not simply *"the act itself."*

*Id.* at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

The United States Supreme Court further determined that to adopt the interpretation proposed by the Kawaauhaus would:

> place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor. . . . A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with the 'well-known guide that exceptions to discharge "should be confined to those plainly expressed.'

*Id*. at 62 (quoting *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)).

More than a year later, the Sixth Circuit Court of Appeals considered the "willful and malicious injury" language contained in Section 523(a)(6), in *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455 (6th Cir. 1999). The Sixth Circuit Court of Appeals interpreted *Geiger*

9

and noted that:

> [t]he [Supreme] Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury." The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury. Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences.

*Id*. at 464.

Based on the language used and analysis of the United States Supreme Court in *Geiger*, the *Markowitz* Court announced the standard of the Sixth Circuit by holding that:

> unless 'the actor desires to cause [the] consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

*Id*. (quoting Restatement (Second) of Torts § 8A, at 15 (1964)); *see Kennedy v. Mustaine*, 249 F.3d 576, 580 (6th Cir. 2001).

In addition to proving a willful injury, a party must also prove that the debtor committed a malicious injury. "'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (citing *Tinker v. Colwell*, 193 U.S. 473, 486 (1904)). If a party fails to prove either willful or malicious, the debt will be discharged. *Markowitz*, 190 F.3d at 463. Inferences can be made, however, if the circumstances surrounding the alleged injury warrant such:

> Determining whether a debtor acted both willfully and maliciously for purposes of § 523(a)(6) requires an examination of that person's state of mind. A debtor will rarely, if ever, admit to acting in a willful and malicious manner . . . [but] both requirements can be inferred through the circumstances surrounding the [involved] injury.

*O'Brien v. Sintobin*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000).

Section 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts.'" *Geiger*, 523 U.S. at 62. Debts that have been determined to fall under Section 523(a)(6) have involved: defamation, malicious prosecution and abuse of process, legal malpractice, libel, patent infringement, intentional infliction of emotional distress, and usurpation of corporate business opportunity. *See Kennedy*, 249 F.3d at 576 (defamation); *Markowitz*, 190 F.3d at 455 (legal malpractice); *Abbo v. Rossi, McCreery & Assocs., Inc. (In re Abbo)*, 168 F.3d 930 (6th Cir. 1999) (malicious prosecution and abuse of process); *Wheeler*, 783 F.2d at 610 (state court libel judgment); *In re Trantham*, 304 B.R. at 298 (pre-petition patent infringement judgment); *Gonzalez v. Moffitt*, 252 B.R. 916 (B.A.P. 6th Cir. 2000) (intentional infliction of emotional distress); *Digital Commerce, Ltd., v. Sullivan*, 305 B.R. 809 (Bankr. W.D. Mich. 2004) (usurpation of corporate business opportunity).

Sexual Harassment Claims Under Section 523(a)(6)

Several bankruptcy courts, examining whether state court sexual harassment judgments or claims are non-dischargeable under Section 523(a)(6), have held that "malice is inherent in finding that the debtor is liable for sexual harassment." *Sanger v. Busch (In re Busch)*, 311 B.R. 657, 667 (Bankr. N.D. N.Y. 2004) (also stating that, "[a]s a matter of law, violations of Title VII [sexual harassment section] will meet the actual malice standard" for Section 523(a)(6) purposes); *Sells v. Porter (In re Porter)*, 363 B.R. 78, 90 (Bankr. E.D. Ark. 2007) (citing *Jones v. Svreck (In re Jones)*, 300 B.R. 133, 140 (B.A.P. 1st Cir. 2003)) ("It has been held that malice is inherent in a finding of liability for sexual harassment even where malice is not an element in the applicable sexual harassment statute.").

In *Busch*, the bankruptcy court stated: "Because sexual harassment is both illegal and morally reprehensible, it is impossible to conceive of an actionable sexual harassment case [where the defendant's] conduct could be construed as anything other than 'wrongful and without just cause or excuse.'" *Busch*, 311 B.R. at 668 (citing *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996)). Similarly, another bankruptcy court, after finding the alleged conduct actionable sexual harassment under Title VII, found it "difficult to see how a man's act of grabbing a woman's crotch and touching her breast, in public, without very strong signals from the woman that such conduct was appreciated, would ever be deemed appropriate, mutually enjoyable, 'fun,' and unlikely to produce any injury[.]" *Liccio v. Topakas (In re Topakas)*, 202 B.R. 850, 861 (Bankr. E.D. Pa. 1996). Another bankruptcy court, also in a Section 523(a)(6) sexual harassment case premised on state law, found that "malice, or intent to harm, in a sexual intentional tort is self-evident, either because the tortfeasor knows his conduct is certain or almost certain to cause harm, or because he should know and therefore the intent is inferred as a matter of law." *Erickson v. Halverson (In re Halverson)*, 226 B.R. 22, 30 (Bankr. D. Minn. 1998) (citing *Johnson v. Miera (In re Miera)*, 926 F. 2d 741 (8th Cir. 1991)).

Like the malicious element, some courts have found that the willful element of Section 523(a)(6) can be met upon a finding of a sexual harassment violation. *See*, *e.g.*, *Voss v. Tompkins (In re Tompkins)*, 290 B.R. 194, 199 (Bankr. W.D.N.Y. 2003) (citing *McDonough v. Smith (In re Smith)*, 270 B.R. 544 (Bankr. D. Mass. 2001); *Thompson v. Kelly (In re Kelly)*, 238 B.R. 156 (Bankr. E.D. Mo. 1999)) ("Notwithstanding *Geiger*, . . . a finding of sexual harassment . . . falls within the discharge exception for willful and malicious injury."); *Topakas*, 202 B.R. at 861 (adversary proceeding trial testimony regarding sexual harassment by defendant sufficed to meet level of intent

12

required for both willful and malicious conduct). Other courts, however, have found that willfulness is not an element of at least Title VII sexual harassment actions. *Busch*, 311 B.R. at 669. "Although sexual harassment . . . presupposes intentional conduct in the form of unwelcome sexual conduct, it does not require that the [harasser] intend to injure the plaintiff." *Id*. The Court notes that the *Busch* Court specifically rejected what it termed "the minority view" that a willful injury can be found where the defendant was substantially certain the injury would result, an express basis for finding willfulness under the Sixth Circuit's holding in *Markowitz*. As *Markowitz* is binding on this Court, the Court declines to follow any holding or inference of *Busch* that is inconsistent with *Markowitz*. In short, this Court is persuaded by those cases finding that actionable sexual harassment demonstrates a willful, in addition to malicious, injury for Section 523(a)(6) purposes.

Analysis

The Court concludes that summary judgment should be granted based upon the above summary judgment standard and the application of collateral estoppel. The Arbitrator's Interim and Final Opinions and the State Court Judgment adopting such sufficiently rise to the level of willful and malicious conduct under the above described Section 523(a)(6) standard. Defendant's actions as described by the Arbitrator demonstrate that Defendant must have intended or have been substantially certain the consequences of his actions would result in the injuries suffered by Plaintiff.

Unlike many tort claims, a Quid Pro Quo sexual harassment claim requires a finding of Section 523 willful and malicious elements. For example, the Court can envision actions that constitute sexual harassment that are not actionable, such as unwanted sexual innuendos. In a Quid Pro Quo claim, however, more is needed, that is, the termination of employment. The act of

13

12-03228-dof    Doc 21    Filed 02/14/13    Entered 02/14/13 11:31:32    Page 13 of 16

terminating employment is by definition a conscious and willful act. Stated differently, employers do not accidently terminate employees, and there is no evidence in this record to suggest otherwise. Here, the Arbitrator found all the necessary elements of a Quid Pro Quo claim, and the elements are sufficient under Section 523(a)(6) to except this obligation from discharge.

The Court draws these conclusions keeping in mind that exceptions to discharge are construed strictly in favor of the debtor, and that the burden is upon Plaintiff to not only establish by a preponderance of the evidence that each of the underlying elements under these subsections of Section 523 have been met, but that, in the context of a summary judgment motion, there are no genuine issues of material fact as to those elements. While Defendant argues that the finding of Quid Pro Quo sexual harassment does not rise to the level of willful and malicious, it is the Arbitrator's findings in the June 8, 2007, Interim Opinion and Award that cause this Court to conclude that summary judgment is appropriate under principles of collateral estoppel, as Plaintiff's Motion is based on a final judgment involving the same parties that actually litigated and necessarily determined the essential elements of his Section 523(a)(6) nondischargeability claim. Specifically, the Arbitrator found that Plaintiff satisfied her burden in establishing a Quid Pro Quo claim under the ELCRA, which requires the claimant to demonstrate that she was subject to the types of unwelcome sexual conduct or communication described in the statute, and that her employer used the employee's submission or rejection of the proscribed conduct as a factor in a decision affecting her employment. In this case, the Arbitrator found that Plaintiff rejected Defendant's unwelcome sexual advances, and when she did, Defendant "followed through with the warnings that he had repeatedly given her in the past and instructed company counsel to terminate [Plaintiff's] employment." This amounts not only to a finding that Defendant's conduct was

willful, but that he acted with malice under Section 523(a)(6) and the cases interpreting such as discussed above.

The Court has considered Defendant's arguments that the Arbitrator's Final Opinion and Award was a compromise award and that the language at the conclusion of the Final Opinion and Award is evidence that Defendant did not act willfully or maliciously. The Court rejects Defendant's reading and arguments because the language in the Final Opinion and Award is clear as to the requisite elements of Section 523. In numerous places, the Arbitrator found in favor of Plaintiff:

> Following the September 21, 2005 telephone call marking the end of their relationship, Mr. Hood left Claimant voicemail and/or email messages on September 30, October 3, and October 12, 2005 stating that he thought about her "all the time." Claimant did not reciprocate these communications, and Mr. Hood's effort to continue sexual relations following the parties' break-up stands as an unwelcome sexual advance under the ELCRA.
>   Claimant has also proven by a preponderance of the evidence that her refusal to reconcile with Mr. Hood was a significant factor in her termination. Claimant credibly testified that Mr. Hood warned her on several occasions during the course of her employment that breaking up with him was "not an option" and that she would be "out of a job" if she ended their relationship. Indeed Mr. Hood made these comments on at least two occasions during the year that Claimant was terminated, including on September 4, 2005, just two months before the termination decision. These pointed and repeated threats made proximate in time to the critical events giving rise to this arbitration simply cannot be dismissed as stray remarks. This arbitrator is left with no doubt that when Claimant rejected Mr. Hood's advances, he followed through with the warnings that he had repeatedly given her in the past and instructed company counsel to terminate her employment.

Second, the Arbitrator expressly found against the Plaintiff as to her Retaliatory Discharge and Title VII claims. This is additional evidence that the Arbitrator carefully considered the evidence and had no difficulty in finding in favor of one side or another.

Finally, Defendant's reading of the language on Page 8 of the Final Opinion and Award is taken out of context. The Arbitrator devoted considerable effort to make findings of fact that, as

15

applied, favored parts of Plaintiff's claim and found against other claims. The last paragraph of the Opinion and Award directed Defendant to reinstate Plaintiff to her prior position as Finance Manager. The last sentence on Page 8 is read by this Court as a statement by the Arbitrator to appeal to the better angels of the parties' nature. Just as President Lincoln's appeal in his first inaugural address failed to avoid the American Civil War, the Arbitrator's words did not have the desired effect. In the context of the Final Opinion and Award, the offered interpretation of the Defendant simply does not convince the Court that it is appropriate to step away from the Arbitrator's findings.

## Conclusion

For the reasons stated above, the Court grants summary judgment in favor of Plaintiff, and the State Court Judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). Further collection of the State Court Judgment shall occur in the Circuit Court for Tuscola County, Michigan. The Court directs Plaintiff, as the prevailing party, to draft and submit an appropriate Order, consistent with the rules of this Court.

**Not for Publication**
`Signed on February 14, 2013`

                                      `/s/ Daniel S. Opperman`
                                      `Daniel S. Opperman`
                                        `United States Bankruptcy Judge`